AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**
June 12, 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>XAVIER JIMENEZ ROBLEDO<br><br>*Defendant(s)* | )<br>)<br>)  Case No. **CR 20-70770-MAG**<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  April 13, 2020 to May 5, 2020  in the county of  Monterey  in the Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and (b)(1)(C) | Distribution and Possession with Intent to Distribute Fentanyl<br><br>Maximum Penalties: 20 years in prison; at least 3 years and up to lifetime supervised release; $1,000,000 fine; $100 special assessment; forfeiture; denial of federal benefits; immigration consequences including potential deportation for non-citizens. |

This criminal complaint is based on these facts:

Please see Affidavit of DEA Special Agent Christopher Flores

☑ Continued on the attached sheet.

/s/ Christopher Flores  by VKD w/permission
*Complainant's signature*

Approved as to form:  ___/s/_____
AUSA Casey Boome

Christopher Flores, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/12/2020

*Virginia K. DeMarchi*
*Judge's signature*

City and state: San Jose, CA

Hon. Virginia K. DeMarchi, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT APPLICATION

I, CHRISTOPHER FLORES, Special Agent with the Drug Enforcement Administration, being duly sworn, hereby declare as follows:

### PURPOSE OF THIS AFFIDAVIT

1. I respectfully submit this affidavit in support of a criminal complaint charging Xavier JIMENEZ ROBLEDO with distribution and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (the "Target Offense").

2. This affidavit is also submitted pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of an application for a search warrant to search residence of Xavier JIMENEZ ROBLEDO at 1380 Military Avenue, Seaside, CA, hereinafter referred to as the **Subject Premises**, and further described in Attachment A-1 hereto, and the vehicle used by JIMENEZ ROBLEDO, a white 1992 Lexus LS sedan with California License Plate No. 5CHK635 and VIN No. JT8UF11E1N0145019, hereinafter referred to as the **Subject Vehicle**, and further described in Attachment A-2 hereto. Attachments A-1 and A-2 are incorporated herein by reference.

3. The items to be searched for and seized, more specifically detailed in Attachment B hereto, include, among other things, electronic and digital data and information contained in computers (specifically, laptop and desktop computers), tablets and mobile telephones that are associated with the **Subject Premises** and the **Subject Vehicle**. The protocol by which these items will be searched is detailed in Attachment C hereto, which is the accepted Northern District of California protocol for searching devices or media that store data electronically.

4. For the reasons stated below, I submit that there is probable cause for the issuance of the requested criminal complaint against Xavier JIMENEZ ROBLEDO and probable cause to believe that the **Subject Premises** and **Subject Vehicle** contain evidence of violations of the Target Offense.

5. The facts stated in this affidavit are based on my personal knowledge, on my

1

review of reports prepared by other law enforcement officers and records prepared by others, and on conversations I have had with other law enforcement officers and witnesses involved in this investigation.  Because this affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint and a search warrant for the **Subject Premises**, I have not set forth each and every fact learned during the course of this investigation.

## AFFIANT BACKGROUND

6.	I am a Special Agent (SA), Criminal Investigator for the Department of Justice, Drug Enforcement Administration (DEA), San Francisco Field Division, San Jose Resident Office, Salinas Post of Duty, and have been so employed since January 2019.  I have been assigned to the Salinas Post of Duty since February 2020.  My daily occupation is the investigation of offenses relating to violations of controlled substances laws and other related offenses.

7.	I attended the Department of Justice, DEA Academy at Quantico, Virginia as part of my basic training to become a Special Agent.  I received approximately seventeen weeks of training on controlled substances, and the investigation of other controlled substance violations.  I learned how each drug is produced/manufactured, processed, packaged, sold, ingested into the human body, and the symptoms a user displays while under the influence of each drug.  I saw samples of controlled substances during my training at the academy, handled and tested each drug, and participated in practical exercises related to the investigation and detection of drug trafficking activities.  Further, training included the documentation of investigative efforts.

8.	After I graduated from the DEA Academy, I participated in a Field Training Agent Program, during which I received hands-on application and training for all aspect of investigative work associated to drug enforcement activities, from experienced senior investigators.  Further, I have received training in the application of search warrants while at the DEA Academy and through my experience.  As a member of the San Francisco Field Division, San Jose Resident Office, Salinas Post of Duty, my exposure thus far has provided me with

experience and training in many facets of drug trafficking and techniques utilized in the manufacture, smuggling, distribution, and sale of controlled substances. My awareness of drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit arise from the following: (a) my training and involvement in drug investigations and searches during my career as a law enforcement officer, as previously described; (b) advisement from other more experienced agents and police related to their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

9. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation in order to obtain the particular warrant at hand.

10. I have personally participated in the investigation of the Drug Trafficking Organization (DTO) discussed in this Affidavit. I have also discussed the investigation with other DEA agents and with other law enforcement agencies involved in it. I have reviewed records and reports relating to this investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another DEA Agent, Special Agent, Law Enforcement Officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed.

## RELEVANT STATUTES

11. Pursuant to Title 21, United States Code, Section 841(a)(1), it is unlawful for any person "knowingly or intentionally to manufacture, distribute or dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance."

12. Title 21, United States Code, Section 812 provides that fentanyl is a Schedule II controlled substance.

**PROBABLE CAUSE**

13.     I submit that there is probable cause to believe that the target of the investigation, Xavier Alexis JIMENEZ ROBLEDO, has violated the Target Offense by distributing fentanyl to at least two individuals who suffered drug overdoses after ingesting the fentanyl that they had purchased from JIMENEZ ROBLEDO.  The first overdose victim survived, but the second passed away.  I further submit that there is probable cause to believe that the information sought by this warrant pertaining to the search of the **Subject Premises** and **Subject Vehicle** will constitute evidence of the crime.

### April 16, 2020 Overdose of Juvenile "S.M." in Pacific Grove, CA

14.     On April 16, 2020, at 7:48 p.m., the Pacific Grove Police Department (PGPD) was dispatched to a report of an unresponsive juvenile ("S.M."). Officers administered two doses of Naloxone and S.M. became responsive. S.M. was transported by paramedics to the Community Hospital of the Monterey Peninsula (CHOMP). After S.M. was removed from his bed, PGPD Corporal Rodriguez observed a small plastic container sitting on top of S.M.'s bed covers.  Corporal Rodriguez opened the container and it appeared to have counterfeit Percocet M30 tablets ("M30s") inside.  M30s are round tablets that are light blue in color with an "M" imprinted on one side and "30" imprinted on the other.  Your affiant has seized M30s in Monterey County in several prior investigations, including prior overdose fatality cases.  Based on my training and my experience in these prior cases, I know that M30s are typically laced with fentanyl.  A toxicology screening of S.M.'s blood at the time of his overdose was positive for the presence of fentanyl.  Analysis conducted by the DEA Western Regional Laboratory of the M30 tablets recovered from S.M.'s bedroom would later confirm that the tablets contained fentanyl.

15.     At the time of his overdose, S.M. was on probation with search terms that included search of his cell phone and social media accounts.  On April 17, 2020, PGPD Detective Ami Lonsinger contacted the Monterey County Probation Office (MCPO) to see if S.M.'s parents would be willing to drop S.M.'s cell phone off at PGPD so the contents could be

reviewed. On the same date, S.M.'s parents left the cell phone along with a note containing the passcode for the phone.

16. On April 21, 2020, PGPD Detective Lonsinger contacted S.M.'s parents who stated that, when S.M. returned from the hospital, they questioned S.M. on where he had obtained the drugs that caused his overdose. S.M. told his parents that the M30s were delivered to his residence by a person he knew as "X" through Snapchat who drove a white-four door Lexus sedan. S.M. indicated that X's true name might be "Javi".[1]

## Review of S.M.'s Cellular Telephone

17. On April 21, 2020, Detective Lonsinger reviewed the contents of S.M.'s cell phone and observed several Snapchat conversations between S.M. (using Snapchat account "thewholeseen") and a contact named "X" with a username of "exxyxavi". The conversations dated back to March 27 and continued until April 16, 2020, the date of S.M.'s overdose, and are indicative of S.M. ordering various types of drugs and reflect S.M. and "X" using Cashapp to exchange money.

18. For instance, on April 13, 2020, S.M. sent "X" a message saying "Send me your Cashapp username g" and "X" responded "$xojennnnyy". Following that message, S.M. sent "X" a screenshot from the Cashapp application showing that he had sent $150 to Jennifer CARDENAS, the user of Cashapp account "$xojennnnyy". A Tracnet records check of the name Jennifer CARDENAS located a recent police contact showing her listed as the girlfriend of JIMENEZ ROBLEDO. A criminal history check of JIMENEZ ROBLEDO showed prior drug related arrests. A California Department of Motor Vehicles (DMV) records check identified JIMENEZ ROBLEDO as having an address of the **Subject Premises**, 1380 Military Avenue, Seaside, CA.

---

[1] On April 16, 2020, the date of S.M.'s overdose, S.M. was evasive with police officers who interviewed him, and he initially told police that another person, not JIMENEZ ROBLEDO, had sold him the M30s that caused his overdose. S.M. later told his parents, without police officers present, that it was "X" (JIMENEZ ROBLEDO) who sold him the M30s.

5

**May 5, 2020 Overdose of Thomas HENDERSON in Carmel Valley, CA**

19.     On May 5, 2020, DEA San Francisco Field Division (SFFD) SA Suzette Abbasciano received a telephone call on the DEA SFFD Duty Phone from Michele Henderson, who called to report that her son, Thomas HENDERSON, recently overdosed and was hospitalized and unresponsive at CHOMP.  A hospital toxicology screening determined that HENDERSON had elevated levels of fentanyl in his system on May 5.[2]  A search of the Monterey County Emergency Communications system showed a 911 call related to HENDERSON's overdose occurred on May 5, 2020 at 6:54 a.m.  HENDERSON remained unresponsive and later died on May 9, 2020.  HENDERSON was 20 years old.

20.     During her May 2, 2020 call to the DEA Duty Phone, Michele Henderson also stated that she observed money transfers in HENDERSON's phone from HENDERSON to someone named "Jennifer".  On May 8, 2020, DEA SAs Trinita Verano and Christopher Flores met with Michele Henderson at her residence in Carmel Valley, CA and took custody of what appeared to be a counterfeit M30 and foil with drug residue, which Mrs. Henderson found in HENDERSON's bedroom on the day of his overdose.  Analysis of the M30 conducted by the DEA Western laboratory confirmed the presence of fentanyl.  Michele Henderson also gave agents HENDERSON's cell phone and explained to SAs Verano and Flores that she maintains joint custody and control over the phone, knows the password to it, purchased the device, and pays the monthly service bill.  Michele Henderson consented to a search of the device and signed a consent to search form.

21.     On May 18, 2020, DEA Group Supervisor Shawn Foust and SA Flores met with Michele Henderson at her residence in Carmel Valley, CA and took possession of numerous counterfeit M30s.  Per Michele Henderson, she was cleaning HENDERSON's room and found the pills inside of a plastic baggie that was located on the table beside HENDERSON's bed. SA's Flores and Verano sent the counterfeit M30s to the Western Regional Laboratory for

---

[2] CHOMP records also indicate that emergency room staff administered fentanyl to HENDERSON during the intubation process.

6

analysis, which later confirmed that the additional M30s also contained fentanyl.

### Review of Thomas HENDERSON's Cellular Telephone

22.     On May 8, 2020, SA Flores conducted an initial physical examination of HENDERSON's cell phone. Upon opening HENDERSON's Snapchat account ("tommyhen10"), SA Flores observed an account utilizing the nickname "X", bearing the same Bitmoji avatar[3] as was previously observed in S.M.'s phone at the top of HENDERSON's list of "best friends". SA Flores observed that when attempting to open the conversations with "X" the conversation page failed to open – possibly indicating that "X" had recently blocked/deleted HENDERSON on the Snapchat application after learning of HENDERSON's overdose. The failure to open was not replicated with any other Snapchat account that had recent communication with HENDERSON.

23.     SA Flores located a screenshot taken on May 4, 2020 at 10:09 p.m. (approximately eight hours before HENDERSON was found unresponsive) of a conversation taking place between "X" and HENDERSON. In the screenshot, "X" said "Yes Bars Coke" (slang terms used to refer to cocaine (Coke) and Xanax/alprazolam (Bars)). SA Flores also located another screenshot taken on April 14, 2020 of Cashapp account "$xojennnnyy" and an additional screenshot showing $180 being sent to Jennifer CARDENAS, the suspected girlfriend of JIMENEZ ROBLEDO. SA Flores located a saved Snapchat communication from Snapchat account "ANDRE$$$$" with the username of "andreselcrazy". In this conversation, "ANDRE$$$$" sent HENDERSON the Snapchat contact information for "X" which showed the username of "exxyxavi".

### Investigation of Snapchat User "X" / "exxyxavi"

24.     On May 9, 2020, Snapchat responded to 2703(d) order 3:20-xr-90494 which was previously served by SA Flores on April 28, 2020. Snapchat identified account "exxyxavi" as having associated display name "X", with an account creation date of June 11, 2014, an

---

[3] A "Bitmoji avatar" is a personalized self-image that the user creates by selecting a number of options, such as skin-tone, hair and eye color, facial hair configurations, or headwear.

associated email address beginning with "Xavierjim10" (consistent with JIMENEZ ROBLEDO's first name, Xavier) and telephone number ending 9340. Records provided by Snapchat showed that "exxyxavi" was friends with and had communications with S.M. (utilizing Snapchat account "thewholeseen") and HENDERSON (utilizing Snapchat account "tommyhen10"). According to Snapchat records, S.M. became friends with "exxyxavi" on March 27, 2020 and HENDERSON became friends with "exxyxavi" on April 6, 2020. Toll records from the phone number ending 9340 show two telephone calls with HENDERSON on April 9, 2020.

25. On May 11, 2020, AT&T Wireless responded to a DEA Administrative Subpoena for records on phone number ending 9340. AT&T identified the number as active and in service since October 11, 2015 under post-paid AT&T account number ending 9487 (indicating that the number ending 9340 is part of a "family plan" where multiple phone numbers are billed under one umbrella account number). AT&T identified the subscriber of the plan as Francisco J JIMENEZ FIGUEROA (believed to be JIMENEZ ROBLEDO's father) at PO Box 913, Seaside, CA. Other telephone numbers associated to AT&T "family plan" account number ending 9487 included a phone number ending 3180, which is subscribed to the **Subject Premises**.

### Telephonic Interview with Witness 1 on May 13, 2020

26. On May 13, 2020, SA Flores conducted a telephonic interview of Witness 1[4] regarding an observation s/he had while staying at the Pacific Grove Beacon House (a drug rehabilitation center) with HENDERSON. Witness 1 reported that, on the day HENDERSON arrived to the Beacon House (April 14, 2020) at some time between 3:00 p.m. and 6:00 p.m., Witness 1 saw an older model, white four-door Lexus sedan (consistent with the **Subject Vehicle**) driven by a young dark-haired female (consistent with Jennifer CARDENAS) with a Hispanic male with short hair in the passenger seat (consistent with JIMENEZ ROBLEDO). Witness 1 stated that s/he saw the Hispanic male exit the vehicle and toss an object towards the

---

[4] Witness 1 was receiving treatment at the Pacific Grove Beacon House at the same time as HENDERSON and has no other known connection to HENDERSON.

8

Beacon House. Witness 1 further stated that s/he learned from other residents of the Beacon House that, at some point later, HENDERSON went to retrieve the object. The review of HENDERSON's cell phone showed payments made by HENDERSON to the Cashapp account associated with Jennifer CARDENAS ("$xojennnnyy") on April 14, 2020. A review of the data provided by Snapchat showed numerous messages exchanged between "X" / "exxyxavi" and HENDERSON on April 14, 2020 between 1:55 p.m. and 3:31 p.m.

### Surveillance at the Subject Premises (1380 Military Avenue, Seaside, CA)

27.     Periodic surveillance at the Subject Premises has identified an older model, white Lexus, four-door sedan matching the description given by S.M. and Witness 1 bearing California license plate 5CHK645, the **Subject Vehicle**. A California DMV records check showed that the **Subject Vehicle** is registered to "JIMENEZFIGUEROA, Francisco J" at the **Subject Premises**, the same individual in whose name the telephone number associated to "X"/"exxyxavi" is subscribed.

28.     On May 21, 2020, at approximately 9:15 a.m., Group Supervisor (GS) Shawn Foust conducted a brief surveillance at the **Subject Premises**. GS Foust observed JIMENEZ ROBLEDO as he exited the front door of the **Subject Premises**. GS Foust recognized JIMENEZ ROBLEDO from his review of JIMENEZ ROBLEDO's California Drivers License photograph. GS Foust observed JIMENEZ ROBLEDO meet with an unknown Hispanic male (UHM). The UHM and JIMENEZ ROBLEDO met on the street just east of the **Subject Premises**. The UHM handed JIMENEZ ROBLEDO an unknown amount of US currency as they walked to a black truck parked on the corner of Military Avenue and Waring Street. The UHM entered the driver's side door of the truck and sat in the driver's seat while JIMENEZ ROBLEDO stood in the street in the open door of the truck. JIMENEZ ROBLEDO handed a small plastic baggie to the UHM and the two parted ways after 2-3 minutes. At approximately 9:41 a.m., GS Foust observed JIMENEZ ROBLEDO as he rested against an Audi sedan, which was parked in the driveway of the **Subject Premises**.

29.     On May 21, 2020, SA Flores positioned a public camera in the vicinity of the

9

**Subject Premises**. The camera was positioned on the street to the east of the residence and recorded the front of the residence between May 21, 2020 and May 24, 2020. Upon reviewing footage obtained during this recording period, SA Flores observed numerous vehicles stopping at the **Subject Premises** for short periods of time and meeting with individuals who have access to the Subject Premises. Based on my training and experience, I know such short stops and meetings are often linked to drug transactions.

### Interview of S.M. in Colorado on May 29, 2020

30. On May 29, 2020, at approximately 9:00 a.m., SA Flores, Fort Collins Post of Duty (FCPOD) SA Jason Tempco, and PGPD Detective Lonsinger (via telephone) conducted an interview of S.M. at a residential drug treatment center located in Colorado. Also present during the interview was S.M.'s counselor.

31. S.M. stated that on the night of his overdose (April 16, 2020) he purchased three M30s and snorted ½ or ¾ of one before he stopped remembering. S.M. stated that he purchased the pills from someone he knew from Snapchat known by "X" or "Xavi". S.M. said that on the day of his overdose, he incorrectly told the responding PGPD Officers that he had purchased the M30s from someone other than "X" and he did this because he was "in panic mode" and wanted to avoid further trouble. S.M. said that he purchased the M30s for $25 each and paid for them by depositing money into a Cashapp account, which used the name Jennifer CARDENAS.

32. S.M. said he has known "X" since around the end of March and had purchased M30s from him twice before and both times "X" delivered the drugs to S.M.'s residence in Pacific Grove, CA. S.M. stated that it took about a half hour from him ordering drugs via Snapchat to the drugs being delivered and believed "X" lived in Seaside or Marina, CA. S.M. described "X" as a young, skinny, Hispanic male adult, with brown hair, wearing a gold chain, and (for one of the transactions) a facemask. Both times "X" delivered drugs, "X" was a passenger in an older model white Lexus sedan that was driven by a Hispanic female that S.M. recognized as the female pictured in the Cashapp account that he had sent drug payments to, Jennifer CARDENAS, the suspected girlfriend of JIMENEZ ROBLEDO. S.M. stated that "X"

10

tried to encourage S.M. to buy more M30s to sell them for him.

33.     SA Tempco presented S.M. with a 6-pack photo lineup containing a photo of JIMENEZ ROBLEDO, however S.M. was unable to identify the person he knew as "X" from the photo lineup.  S.M. noted that he had only seen "X" briefly on two occasions when he bought drugs from "X" and that "X" was wearing a facemask during one of the two transactions.  SA Flores showed S.M. a photo of the **Subject Vehicle** and S.M. confirmed it was the vehicle that he saw CARDENAS driving with "X" in the passenger seat for both drug transactions that S.M. conducted with "X".

## KNOWLEDGE REGARDING NARCOTICS TRAFFICKING

34.     Based on my experience and training and through consultation with experienced Special Agents and police officers, I know the following with respect to narcotics traffickers:

   a.   They commonly have multiple residences or locations they control. Persons who violate narcotics laws are known to keep their illegal contraband, U.S. currency/profits, and their related records in multiple locations that they have access to and control over.  This is done in an attempt to avoid detection from law enforcement, as well as to avoid detection from other criminals and/or rivals who may potentially steal/rob them of their contraband and/or profits.

   b.   Drug traffickers commonly possess firearms and ammunition, including handguns, pistols, revolvers, rifles, shotguns, silencers, explosives, incendiary devices, and other weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions.  Such weapons are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

c. Narcotics traffickers will generally keep a supply of narcotics on hand for immediate sale. Narcotics traffickers will often hide their supply of narcotics in close proximity to their firearms in garages, outbuildings, storage areas, vehicles, and/or sheds associated with or near their residences, or in yard areas surrounding such premises, or otherwise attempt to conceal the presence of both narcotics and firearms they possess.

d. Narcotics traffickers maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their trafficking activities, in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the disposition of drug proceeds. Moreover, because narcotics traffickers will often "front" (that is, sell on consignment) narcotics to their clients and sometimes be "fronted" narcotics from their suppliers, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. Such records, which are frequently encoded in order to protect those involved in the distribution activities, will often be maintained by traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods and similar storage media), cell phones, and/or personal digital assistants such as smart phones.

e. Narcotics traffickers maintain bank account records, wire transfer records, bank statements, money drafts, checks, letter of credit, credit card bills,

    safety deposit keys and records, money wrappers, money containers, income tax returns, records of financial transfers which reflect the money generated from the sale of narcotics.

f. Narcotics traffickers maintain items showing unexplained wealth or evidencing the proceeds derived from illicit trafficking, including records concerning currency, precious metals, and/or jewelry; documentation relating to the purchase of real estate or motor vehicles; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders, travelers checks, bonds, stock certificates, passbooks, bank checks, bank deposit tickets, certificates of deposits, income tax returns, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money, money counting machines, money wrappers and bags.

g. Narcotics traffickers maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses and email addresses, for the purpose of contacting their suppliers, customers, transporters and others involved in their illicit distribution activities, and these records are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their trafficking business. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (as mentioned above).

h. Narcotics traffickers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct firearms and/or narcotics transactions, or to transport contraband or illicit proceeds. Documents relating to such travel, such as calendars, travel

     itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information, and records and receipts associated with airlines, rental car companies, and/or hotels, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by traffickers on their person, in their residences, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (as mentioned above).

  i. Narcotics traffickers use devices to conduct counter surveillance against law enforcement, such as two-way radios, police scanners, video surveillance systems, anti-bugging devices, police radios, surveillance cameras, monitors and recording devices.

  j. Narcotics traffickers that engage in the sort of illegal activities described above are often arranged through the use of communication devices such as cell phones. People who negotiate the illegal sale of narcotics often use cell phones to contact their sources of supply to obtain additional quantities of narcotics. Similarly, they will use cell phones to contact their customers to facilitate these illegal transactions, specifically to discuss quantity and price, and arrange meeting locations. Further, people who negotiate these illegal sales will often have their records of telephone calls, text messages, SMS messages, and voicemails stored within the device and with the electronic communications storage for the mobile telephone service provider. Mobile telephones are often programmed for speed dialing, contain contact lists, and recent call activity.

## REQUEST TO SEAL THE COMPLAINT, SEARCH WARRANT, AND THIS AFFIDAVIT

35. I believe that, should the contents of this warrant and affidavit be made public, it would jeopardize the search of the locations, the arrest of the defendant, this ongoing investigation, and any personnel assigned to or cooperating in this investigation. Should the

existence of this criminal complaint, search warrant, and affidavit be disclosed, individuals involved in the illegal activities under investigation would likely be prompted to destroy or hide evidence, notify co-conspirators, or flee from prosecution. Therefore, for the foregoing reasons, and because this is an ongoing investigation, I respectfully request that the criminal complaint, the search warrant, this affidavit, and all related documents, be sealed until further order of the Court.

## CONCLUSION

36.     For the foregoing reasons, I respectfully submit that there is probable cause to believe that Xavier JIMENEZ ROBLEDO has committed a violation of Target Offense and that the **Subject Premises** and **Subject Vehicle** contain evidence of that violation. I therefore respectfully request the issuance of a criminal complaint and a warrant to search the **Subject Premises** and **Subject Vehicle** (as further described in Attachments A-1 and A-2) for the items set forth in Attachment B, according to the procedures set forth in Attachment C.

/s/ Christopher Flores  by VKD  w/permission
Christopher Flores
Special Agent
Drug Enforcement Administration

*Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this* 12th *day of June, 2020.*

HON. VIRGINIA K. DEMARCHI
United States Magistrate Judge

15